# STATE OF VERMONT

# ENVIRONMENTAL COURT

Appeal of Mary Dowling      }
                           }     Docket Nos. 179-8-02 Vtec;
                           }     235-10-02 Vtec; and 269-12-
                           }     02 Vtec
                           }

## Decision and Order

Appellant Mary Dowling appealed from two decisions of the Zoning Board of Adjustment (ZBA) and one decision of the Planning Commission of the Town of Stowe, granting approval for two projects within the Topnotch Resort Planned Unit Development. Appellee-Applicant T.N. Associates, Inc., doing business as Topnotch, also appealed from one of the findings made by the Planning Commission in its decision.

Appellant Mary Dowling is represented by George E.H. Gay, Esq.; Appellee-Applicant T.N. Associates, Inc., doing business as Topnotch, is represented by David Gartenstein, Esq.; the Town of Stowe is represented by Amanda S.E. Lafferty, Esq. An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. The parties were given the opportunity to submit written requests for findings and memoranda of law. Upon consideration of the evidence and the written memoranda and proposed findings, the Court finds and concludes as follows.

Appellee-Applicant owns and operates a 110-acre Resort Planned Unit Development (the " Topnotch Resort PUD" ), consisting of land on both sides of Route 108 in the Upper Mountain Road zoning district and the RR5 zoning district of the Town of Stowe. The main Topnotch Inn buildings are located on the east side of and uphill from Route 108, approximately 75 feet from the southerly property boundary of the overall Topnotch Resort PUD property. A parking lot referred to as the " east" parking lot is located easterly of the Inn building adjacent to the southerly property line. Appellant owns property immediately to the south of and generally downhill from the Topnotch Resort PUD property. The property line between Appellant' s property and the Topnotch Resort PUD property makes a rectangular jog approximately 150 feet in length along the property line and approximately 50 feet in depth onto what would otherwise be Appellant' s property. This jog accommodates the southerly most end of the east parking lot, and contains fourteen of the lot' s parking spaces. The property line contained this jog and the east parking lot when Appellant acquired the property. Appellant has experienced serious problems from time to time in the past with stormwater drainage from the Topnotch Resort PUD property, and especially from the east parking lot, onto her property.

Appellee-Applicant applied for approval to develop two projects: the ' Spa/Laundry' project and the ' Phase F Condominiums,' accompanied by changes to Appellee-Applicant' s stormwater management system, all within Appellee-Applicant' s existing approved Resort PUD. The

Topnotch Resort PUD, including these two projects, is now served by municipal sewer service and water supplies.

As an amendment to a conditional use, the Spa/Laundry project required review under the following sections of the Zoning Regulations: § 4.7 (Conditional Use Standards), § 4.9 (Site Plan Review), § 7.3(2) through (4) (Upper Mountain Road) and § 18.3 (Resort PUD). The ZBA's July 16, 2002 decision on this application is on appeal in Docket No. 179-8-02 Vtec. As a subdivision, the Phase F Condominiums project required review by the Planning Commission for final subdivision approval under the Subdivision Regulations. The Planning Commission's September 24, 2002 decision on this application is on appeal in Docket No. 235-10-02Vtec. As an amendment to a conditional use, the Phase F Condominium project also required review under the following sections of the Zoning Regulations: § 4.7 (Conditional Use Standards), § 4.9 (Site Plan Review), § 7.3(2) through (4) (Upper Mountain Road) and § 18.3 (Resort PUD). The ZBA's October 15, 2002 decision on this application is on appeal in Docket No. 269-12-02 Vtec.

At trial, Appellant stipulated that only the following provisions of the Zoning Regulations remain at issue in these proceedings:

Conditional Use Standards: § 4.7(2)(A)(3) (character of the area affected); § 4.7(2)(B)(1) (soil erosion and capacity of land to hold water), § 4.7(2)(B)(2) (aesthetics and natural areas), § 4.7(2)(B)(5) (shared access), § 4.7(2)(B)(6) (circulation and parking), § 4.7(2)(B)(7) (pedestrian circulation and access), § 4.7(2)(B)(8) (landscaping and screening), and § 4.7(2)(B)(9) (stormwater management);

Site Development Plan Required Information: § 4.8(2) (landscaping plan), § 4.8(3) (parking plan), § 4.8(4) (stormwater drainage plan), § 4.8(5) (site grading plan), § 4.8(6) (lighting plan), and § 4.8(7) (completion schedule);

Site Development Plan Review Procedure: § 4.9(1)(A) (compatibility with municipal plan), § 4.9(1)(B) (adequacy of driveway access), § 4.9(1)(D) (circulation and parking), § 4.9(1)(F) (landscaping and screening), § 4.9(1)(G) (stormwater management); 4.9(2)(B)(2) (parking specific to Upper Mountain Road zoning district) and 4.9(2)(B)(3) (driveway access specific to Upper Mountain Road zoning district);

Stormwater Management Standards: § 4.15 (all subsections);

Standards for Development in the Upper Mountain Road District: § 7.1 (purpose statement: "preserving the rural character of the landscape"); § 7.7(2) (driveway setbacks);

Standards for Planned Unit Developments: § 18.3(1)(A) (amended density affidavits); § 18.3(3)(A) (perimeter greenbelt), § 18.3(3)(B)(incorporating PRD standards from § 17.3(2), § 17.3(3), and § 17.3(4)); § 18.3(4) (open space); and

Parking Standards: § 21.3 (required parking area); § 21.4(1) (no parking in fire lanes), § 21.4(4) (stormwater discharge from parking surfaces onto adjacent property); and § 21.5 (driveway setbacks).

Appellant also stipulated at trial that only the following provisions of the Subdivision Regulations remain at issue in these proceedings:

Subdivision Application Procedures: § 3.1(1);

Preliminary Layout Application Procedures: § 3.3(1), § 3.3(3), § 3.3(4);

Preliminary Layout Application Submission Requirements: § 4.1(L), § 4.1(P);

Final Subdivision Application Submission Requirements: § 4.2(H), § 4.2(I);

Legal Requirements: § 4.4(1)(B), § 4.4(1)(C);

General Planning Standards: § 5.1(1) (character of land for subdivision), § 5.1(2) (natural and scenic features), § 5.1(5)(screening and landscaping), § 5.1(13) (disclosure of subsequent development plans);

Open Space and Cluster Development: § 5.3 (all subsections); and

Utilities and Stormwater Management: § 5.5(4), § 5.5(5).

The Spa/Laundry project involves the expansion of the spa building by 6,835 square feet to house new treatment rooms, an expanded hair salon, a new front entrance and an office; the relocation of Appellee-Applicant's laundry facilities to a new 960-square-foot building across Route 108 behind the tennis center; the conversion of an existing tennis court to a parking area; and the rerouting of stormwater from the east parking lot to an existing treatment and detention pond.

A 53-unit, 29.4-acre condominium development (the "Overlook Condominiums at Topnotch Resort") was approved in 1981 as a Planned Residential Development (PRD), located within the Topnotch Resort PUD. The ten units now proposed for the Phase F condominiums will complete 52 of the 53 approved units. The major infrastructure for the Phase F Condominiums, including water and sewer mains and a looped access road, has already been built pursuant to the plans previously approved for the whole Planned Residential Development. The current Phase F Condominium Project includes the subdivision of the land where the Phase F Condominium buildings will be located, so that the boundary lines run along the border of the Open Space area approved in 1981 as part of the Planned Residential Development and along the boundary lines of previous subdivisions for earlier phases of development within the PRD. The Phase F Condominium Project also includes the installation of 520 feet of 8-inch water line running from Route 108 to behind the spa building and a fire hydrant to improve fire protection[1]; the construction of five buildings each containing two condominium units, for a total of ten units, including the site work specific to each building needed to connect the buildings to the existing

PRD infrastructure; and the implementation of a stormwater management plan that directs most of the stormwater generated on the developed portion of the Appellee-Applicant's property easterly of and uphill from Route 108 to an already existing detention pond located close to Route 108.

Issue regarding Post-Approval Submission Conditions

Appellant's Amended Statement of Questions raised the issue of whether certain conditions, requiring subsequent proposals to be submitted to the ZBA, violated various notice requirements. As the application now contains those amendments and this proceeding is de novo, that issue has become moot, or at least provides no basis for remanding the application to the ZBA. The Court will merely consider the updated parking plan, the elevations and fenestration of the spa and laundry, the landscaping and exterior lighting plan, an updated density bank affidavit, and the amended application (including both the stormwater run-off pipe line and conversion of the upper tennis court to parking) as part of the merits of the application now before the Court. In any event, the matters that were the subject of the contested conditions had been addressed in Appellee-Applicant's original application submitted to the ZBA. The contested conditions merely required the Applicant to submit, in written or plan form, those details or commitments on the part of the Applicant that were discussed before the ZBA at its public hearing and that had become part of the ZBA's approval of the project. See Appeal of Gulli, 13 Vt. L. Week 349, 350 (Nov. 4, 2002) (mem.).

Character of Area, Suitability of Land and Compatibility with Stowe Town Plan

Section 4.7(2)(A)(3), § 4.9(1)(A) and § 7.1 of the Zoning Regulations and § 5.1(1) of the Subdivision Regulations address whether the proposed projects will adversely affect the character of the area; whether they will preserve the rural character of the upper Mountain Road area landscape; whether the subdivided land can be used for its intended purposes without undue adverse impact on public health or safety, the environment, neighboring properties, or the rural and historic character of the community; and whether the proposed projects are compatible with the Stowe Municipal Plan.

As designed, the subdivided land can be used for its intended purposes without undue adverse impact upon Appellant's property or upon any other neighboring properties, or upon public health or safety, the environment, or the rural and historic character of the community. The proposed improvements to the stormwater systems draining the Topnotch Resort PUD and the proposed improvements to the drainage and landscaping of the east parking lot will reduce the stormwater runoff onto Appellant's property to an amount below that experienced by that property before the Topnotch Resort PUD was developed, and will therefore reduce the likelihood of recurrence of the problems experienced by Appellant in recent years due to stormwater runoff onto her property. The proposed erosion control measures during construction will protect downhill property, including Appellant's, from undue soil erosion. Appellant proposes to install the new stormwater improvements starting with the pond and the improvements to the Inn parking lot, and then to install the stormwater line from the Inn to the pond, and then to install the stormwater line above the Inn, and then to install the new 8" water

line. All the stormwater system improvements are proposed to be in place before the construction of the Phase F condominiums.

The proposed expansion of the existing spa building and conversion of a tennis court to parking will not be noticeable from Route 108 or from beyond the Topnotch Resort PUD property. The proposed small new laundry building behind the large tennis center on the other side of Route 108 will not be noticeable from Route 108 or from beyond the Topnotch Resort PUD property, and would have the appearance of a small outbuilding consistent with the design of the tennis center building and another small maintenance shed behind that building. The proposed Phase F condominiums are consistent in design, location, and layout with the other condominiums approved as part of the PRD. Therefore, the proposed projects will not adversely affect the character of the area, will not adversely affect the rural and historic character of the community and will preserve the rural character of the upper Mountain Road area landscape at least as much as the existing Topnotch Resort PUD.

In addition, the proposed projects are compatible with the current edition of the Stowe Municipal Plan. The expansion of the spa building, relocation of the laundry, and associated improvements to the stormwater and parking systems for the Topnotch Resort PUD are compatible with the Municipal Plan's provision for Resort PUDs to "allow a large resort, being a self-contained complex developed as a single entity to provide housing (hotel/motel, lodge), recreation and services for its transient guests, and be insulated from, and not intrude on, surrounding areas." Municipal Plan, page 10-8. The Plan encourages clustering development, and favors Planned Residential Development over standard subdivisions "to enable and encourage flexibility of development of land to preserve open space, to encourage clustering and to facilitate adequate and economical provision for streets and utilities." Municipal Plan, page 10-8. The Phase F condominiums, approved as part of a Planned Residential Development, are compatible with the Municipal Plan in that respect, and preserve all of the open space area reserved within the PRD and the Topnotch Resort PUD.

Access and On-site Circulation

Section 4.7(2)(B)(5), § 4.7(2)(B)(7), § 4.9(1)(B), § 4.9(2)(B)(3), and § 7.7(2), of the Zoning Regulations address on-site circulation and access from the public road system.

No changes in the Topnotch Resort PUD's access to Route 108 are proposed in connection with the proposed projects. That easterly entrance point from Route 108 is adequate under § 4.9(1)(B) as approved for the overall Topnotch Resort PUD, and the relatively small number of additional vehicle trips generated by the ten new condominium units will not affect the adequacy of that access. Adding shared access for the Dowling property to the existing single access from Route 108 onto the Topnotch Resort PUD property would not be appropriate under § 4.7(2)(B)(5). Adding shared access is not practicable with either the property to the north or with the property to the south, because a stream separates the Topnotch Resort PUD entrance drive from the property to its north and because steep grades prevent shared access to that entrance drive with the adjacent property to the south.

Pedestrian circulation and access as previously approved for the Topnotch Resort PUD, is unchanged by the proposed projects. § 4.7(2)(B)(7). On-site circulation of vehicles as previously approved for the Topnotch Resort PUD will be somewhat improved under the site plan with the improvement of the east parking lot, the conversion of the tennis court to parking for the spa, and the reduction in parking congestion near the entrance to the spa.

The only added driveways as part of the proposed projects are the individual interior driveways within the PRD area needed to serve the ten individual units of the Phase F Condominiums. They are no wider than that necessary to provide safe vehicular access and promote pedestrian circulation, § 4.9(2)(B)(3). In any event, that section only applies to the Upper Mountain Road zoning district and the Phase F condominium area is outside that district (see Exhibit 12). The driveways meet all dimensional standards and do not implicate § 7.7(2), which requires driveways to be set back at least 10 feet from property lines.

None of the regulatory sections remain at issue which address the effect of traffic generated by the projects on traffic on roads and highways in the vicinity. In any event, very little, if any, additional traffic on Route 108 will be generated by the spa expansion or by the relocation of the laundry, because the expanded spa will continue to be used primarily by existing Topnotch guests and residents and the relocated laundry will continue to serve the whole Topnotch Resort PUD. Construction of the Phase F Condominiums is likely to generate no more than between two and five additional afternoon peak vehicle trips on Route 108. Existing roads, intersections and access points remain adequate to handle this minor amount of additional traffic, if any, that will be generated by the proposed projects.

Parking

Section § 4.7(2)(B)(6), § 4.8(3), § 4.9(1)(D), § 4.9(2)(B)(2), § 21.3, § 21.4(1), § 21.4(4), and § 21.5 of the Zoning Regulations address parking requirements, and are all met by Appellee-Applicant's proposed projects.

Appellee-Applicant proposes improvements to the east parking lot, changes to the configuration of parking in front of the spa building, conversion of tennis courts to parking to serve the spa building, as well as the individual parking spaces allocated to each of the ten proposed condominium units, consisting of two parking spaces outside each unit and one space inside a garage associated with each unit. The parking associated with the condominium units meets all regulatory requirements. We will discuss the other parking-related proposals in more detail.

The number of parking spaces for the Topnotch Resort PUD meets the requirements of the regulations with the proposed changes. The small reduction in the number of spaces in front of the spa building will be more than offset by the conversion of an existing tennis court near the spa to a parking area to serve the expanded spa, together with improvements to the east parking lot.

Appellant requests a prohibition against parallel parking along the access road between the east parking lot and the expanded spa building. Appellee-Applicant does not propose any parallel parking along that road, and there has been no evidence that the on-site circulation and driveway

width would be adequate for both vehicular and pedestrian circulation if such parallel parking were allowed. Accordingly, it will be sufficient to require Appellee-Applicant to post signs along the access road between the east parking lot and the first spa parking spaces, stating to the effect of ' no parking along this roadway.' In the alternative, if Appellee-Applicant wishes to allow such parallel parking and to have it evaluated for adequacy of vehicular and pedestrian circulation, Appellee-Applicant is free to apply for an amendment at the municipal level to do so.

All new parking proposed as part of the proposed projects is in the interior of the Topnotch Resort PUD property and cannot be seen from off site or from Route 108. None of the proposed parking lies between buildings and the public road, or along any public road. Rather, parking is located behind buildings to the extent possible, and is not proposed to be situated in rights-of-way. Parking associated with the proposed projects meets the dimensional requirements of the Zoning Regulations, including sizes, layout and numbers of parking spaces and aisle widths allowing the free and safe movements of vehicles using those spaces. The proposed parking will be paved with an all-weather surface, and the spaces will be delineated by appropriate striping. The edge of the paved spaces in the east parking lot are set back at least ten feet from the property line to Appellant' s property, meeting § 7.7(2) assuming that section applies to parking spaces as well as to driveways.

The access roadways and parking areas associated with the proposed projects will be engineered to drain through storm drains adequate to handle runoff from them, and will eliminate both standing water and excess runoff to abutting land, including that of Appellant. Specifically with respect to the southerly edge of the east parking lot, the slope of the land is proposed to be added to, to create a foot-high berm at the edge of Appellant' s property. The east parking lot and its southerly setback area are proposed to be graded so that the whole of the east parking lot will drain toward the stormwater management system' s catchbasins within the parking lot, rather than toward Appellant' s land, and so that any water melting from snow plowed off those spaces towards Appellant' s land will also run off towards the storm drainage system within the parking lot. The southerly setback area is proposed to be landscaped with trees for screening and erosion control, and to have snow fencing installed each winter to prevent snow from being plowed onto Appellant' s property. Appellee-Applicant proposes to remove snow from this area promptly after winter storm events, to minimize the effect of runoff from large snow piles. At the westerly edge of the jog in the parking lot, a grassy swale is designed to conduct any remaining surface runoff to the storm drains in the parking lot. Even if the storm drainage system in the parking lot were to become clogged with ice and snow, after construction the lot and access road will still be sloped so that any overflow runoff will run down the access road rather than onto Appellant' s property.

Stormwater, Erosion, Sewer, Water, and Utilities

Section 4.7(2)(B)(1), § 4.7(2)(B)(9), § 4.8(4), § 4.8(5), § 4.9(1)(G), § 4.15(A), § 4.15(B), § 4.15(C), § 4.15(D), § 4.15(E), § 4.15(F), § 17.3(3) and § 17.3(4) of the Zoning Regulations and Section 4.1(L), § 4.2(H), § 4.2(I), § 4.4(1)(B), § 4.4(1)(C), § 5.5(4) and § 5.5(5) of the Subdivision Regulations address stormwater, erosion, sewer, water, and utilities and are all met by Appellee-Applicant' s proposed projects.

Construction associated with the proposed projects will yield a total of just over 1/3 of an acre of new impervious coverage on the Topnotch Resort PUD property. This additional coverage will have little or no additional effect on stormwater generation on the Topnotch Resort PUD property. That is, even in the absence of the new stormwater management proposals, little or no additional stormwater would have been directed onto Appellant's adjoining property, and the proposed projects would not cause unreasonable soil erosion or reduce the capacity of the land to hold water. § 4.7(2)(B)(1). Nevertheless, the proposed projects include a comprehensive new stormwater management plan for the Topnotch Resort PUD Property to conform with the State stormwater regulations that took effect in August of 2002 and for evaluation under § 4.7(2)(B)(9).

The proposed stormwater management plan intercepts and collects stormwater in new catchbasins to be installed in the parking areas and roadways, conducted it to an existing detention pond near Route 108, and, after detention, discharges it onto property of the Topnotch Resort PUD on the other side of Route 108, to infiltrate into a recharge area under a state-approved stormwater discharge permit. The proposed stormwater management system uses the best available technology to minimize off-site stormwater runoff, to increase on-site infiltration, to encourage natural filtration functions, to simulate natural drainage systems and detention and retention basins, and to minimize off-site discharge of pollutants.

After installation of the new stormwater system, the rate of stormwater runoff will not be increased beyond current levels at the boundary of the property, and indeed, will be reduced from pre-development levels as it pertains to Appellant's property. Prior to any development of the Topnotch Resort PUD property, stormwater from 1.98 acres of land within that property discharged to the south onto land currently owned by Dowling and Gill. Following implementation of the proposed stormwater management plan, stormwater from 1.34 acres of land within the Topnotch Resort PUD property will discharge to the south onto land owned by Dowling and Gill. As a result, the proposed projects will improve existing stormwater-related conditions towards Appellant's property and will have no adverse impact on stormwater effects on Appellant's property, any other property (including the Topnotch Resort PUD property), on Town highways, or on surface waters. The rate of stormwater discharge will not increase at the property line. The stormwater management plan associated with the proposed projects will protect natural drainage ways and floodwater retention areas, so that existing drainage patterns will not change so as to adversely affect adjoining properties.

The changes to the configuration, grading and paving of the east parking lot, described above, together with the new stormwater management system, are adequate to protect the Dowling property from being adversely affected by stormwater from the proposed projects.

In connection with the proposed projects, Appellee-Applicant also has proposed a comprehensive erosion control plan to be implemented during construction, to minimize and stabilize exposed soil, control sediment discharge and stormwater during construction, account for all natural and proposed contours and grading changes, and to prevent reduction in the capacity of the land to hold water, and thereby avoid creating a dangerous or unhealthy condition.

Water, noise, and air pollution will not result from the proposed projects. The proposed projects are served by and have received all necessary permits to connect to the municipal water and sewer systems, and, as discussed above, the discharge of stormwater to abutting properties will decrease as compared to both pre-development and current conditions. Therefore, Appellee-Applicant need not provide any detailed information regarding the location of neighboring water supplies and sewage disposal areas, or a report on land and soil conditions, and need not submit any evidence of agreements with other landowners, easements, or rights to discharge water onto other properties, as no such agreements are proposed to be necessary for the proposed projects. § 4.1(L), § 4.2(H), § 4.2( I), § 4.4(1)(B), and § 4.4(1)(C) of the Subdivision Regulations.

Landscaping, Screening, Lighting, Scenic and Natural Areas, Open Space

Section 4.7(2)(B)(2), § 4.7(2)(B)(8), § 4.8(2), § 4.8(6), § 4.9(1)(F), § 17.3(2), § 18.3(1)(A), § 18.3(3)(A), § 18.3(3)(B), and § 18.3(4) of the Zoning Regulations and Sections 4.1(P), § 5.1(2), § 5.1(5), and § 5.3 of the Subdivision Regulations address landscaping, screening, distances between buildings, density affidavits, lighting, scenic and natural areas, and open space.

The proposed projects are located within the existing Topnotch Resort PUD and the existing PRD governing the condominiums. None of the buildings, parking lots, or lighting associated with the proposed projects will be visible from Route 108 or from any other property beyond the Topnotch Resort PUD property. No additional lighting is proposed for the east parking lot beyond any lighting already approved for that lot. There are no rare or irreplaceable natural areas on Topnotch Resort PUD property, and the proposed projects will not adversely affect the area's scenic or natural beauty, aesthetics, natural features, forest vistas, wildlife, natural resources, or rural landscapes. The design of the proposed projects, including the location of the additions to the spa building and the new laundry building in areas where there already is impervious coverage; the construction of the Phase F Condominium buildings adjacent to infrastructure that has already been approved and constructed; the placement of storm drain, water, and sewer lines; and the preservation of existing recreational trails, will further minimize any potential impact to natural features and will preserve existing natural and scenic features, bodies of water, and wooded areas on the Topnotch Resort PUD property, including all areas reserved as open space areas in the existing permits for the Topnotch Resort PUD and the Planned Residential Development. Within the PRD, 8.8 acres of open space land has been dedicated for conservation purposes, where existing natural features will be preserved; this open space land will be owned and managed by a condominium Area Association upon completion of the PRD

The landscaping and lighting plans for the new condominium units and the spa expansion and associated parking are consistent with the existing condominiums and spa building and meet all requirements regarding glare, lighting and landscaping. The landscaping at the edge of the east parking lot will screen Appellant's property from activity in that parking lot, and no additional lighting is proposed for that parking lot.

Appellee-Applicant has submitted revised density affidavits as required by the regulations. The distances between the Phase F condominium buildings are appropriate for clustered development and to preserve other portions of the property for open space use as encouraged by the Municipal Plan and by the PRD regulations.

Section § 18.3(3)(A), requires a green belt perimeter of at least 200 feet along the outside boundary of a Resort PUD, which requirement can be waived by the Planning Commission if it is not necessary to protect the interests and privacy of adjoining property owners[2]. The overall layout of the Topnotch Resort PUD was approved in earlier proceedings, and if this 200-foot perimeter greenbelt was a requirement of Resort PUDs at that time, it was apparently waived in the vicinity of the east parking lot at that time. The waiver of that greenbelt requirement and the existence and location of the east parking lot are not before the Court in the present proceedings.

Phasing and Future Development Plans

Section 4.8(7) of the Zoning Regulations and § § 3.3(4) and 5.1(13) of the Subdivision Regulations address the time schedule for and phasing of construction and future development plans. Sections 3.3(1) and 3.3(3) of the Subdivision Regulations are not applicable to a subdivision such as the present one that creates only one new lot. Section 3.1(1) of the Subdivision Regulations has been satisfied as a plat regarding the proposed subdivision has been filed in the Stowe Land Records.

Appellee-Applicant has submitted a time schedule for construction and a phasing plan that calls for implementation of its stormwater management plan as soon as permits are issued. The time schedule and phasing plan are appropriate, as adjusted to date from when the permits become final. Appellee-Applicant stated at trial that construction of the Phase F condominiums would take place after the installation of the stormwater management system below it in elevation; we have imposed that requirement as a condition in this decision and order to insure that disturbances of the land at higher elevations do not result in stormwater runoff problems at lower elevations, however temporary.

This application covers only the spa/laundry project and the Phase F condominiums as described above. The 53rd condominium unit allowed by the earlier PRD approval would have to be the subject of a future application, as would any other development to be served by the stormwater system. Appellee-Applicant proposes no other development at this time.

Based on the foregoing, it is hereby ORDERED and ADJUDGED that Appellee-Applicant's proposed projects as presented to the Court meet the requirements of the Zoning Regulations and Subdivision Regulations as discussed above and are HEREBY approved, with the following conditions.

1. Appellee-Applicant shall construct the proposed projects as shown in the application and plans and exhibits submitted in evidence in the proceedings before this Court, and shall provide a set of those documents for the files of the Town of Stowe.

2. The proposed stormwater system improvements shall be constructed prior to the commencement of site work on or construction of the buildings of the Phase F condominiums. All the berms and grading of the area adjacent to Appellant's property shall be in place, so as to direct any runoff away from Appellant's property, before the commencement of work on the improvements to the east parking lot, including the commencement of work on the installation of the stormwater system within or at a higher elevation than the east parking lot.

3. Appellee-Applicant shall post signs along the access road between the east parking lot and the first spa parking spaces, stating to the effect of ' no parking along this roadway.' In the alternative, if Appellee-Applicant wishes to allow such parallel parking and to have it evaluated for adequacy of vehicular and pedestrian circulation, Appellee-Applicant is free to apply for an amendment at the municipal level to do so.

4. Any additional lighting for the east parking lot beyond any lighting already approved for that lot also shall be the subject of a future amendment application.

Dated at Barre, Vermont, this 16th day of October, 2003.

_____
Merideth Wright
Environmental Judge

### Footnotes

1. Prior to the extension of municipal water to serve this project, water for fire protection for the condominiums was provided from a pond or reservoir.

2. An additional clause regarding this waiver provision appears to be missing from the copy of the regulations in evidence.